IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LYNN ALLEN JOHNSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>USANA HEALTH SCIENCES, INC., a Utah corporation,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00652-RJS-DBP<br><br>Chief Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

This case arises from the 2011 termination of Plaintiff Lynn Allen Johnson's distributor agreement with Defendant USANA Health Sciences, Inc., a multi-level marketing company. Johnson alleges USANA breached the parties' agreement when it terminated her distributorship. USANA maintains it was within its contractual rights to terminate, as Johnson had first violated binding company policy prohibiting distributors from engaging in unauthorized recruiting activities with other multi-level marketing business ventures.

Two motions are before the court: Johnson's Motion for Summary Judgment[1] and USANA's Motion for Summary Judgment.[2]  For the reasons stated below, Johnson's Motion is DENIED and USANA's Motion is GRANTED.

---

[1] Dkt. 165 (Plaintiff's Motion for Summary Judgment).

[2] Dkt. 162 (Defendant's Redacted Motion for Summary Judgment); Dkt. 164 (Defendant's Sealed Motion for Summary Judgment).

## BACKGROUND[3]

### *Johnson's Distributorship*

USANA produces and sells "nutritional supplements, personal care products and food products" in the United States and internationally.[4]  The company uses a structure known as "multi-level marketing" or "network marketing," which involves "a person-to-person network of sellers and consumers as opposed to online or brick and mortar retail outlets."[5]  The sellers—known as "distributors" or "associates"—"are independent contractors that earn revenue by either reselling USANA products directly to consumers or by earning commissions from the product sales of others who have been recruited to become USANA associates and joined their 'downline.'"[6]

The parties' relationship began on October, 3 1997, when Johnson signed a USANA Distributor Application and Agreement (the 1997 Agreement).[7]  The 1997 Agreement contains the following clauses:

> APPLICANT has read and agrees to be bound by the terms of this Agreement, . . . and the Policies and Procedures, all of which are incorporated herein by reference and made a part hereof for all purposes. USANA reserves the right to change the Compensation Plan and the Policies in its sole discretion, and APPLICANT agrees to be bound by such changes.[8]

> The undersigned hereby agrees that he/she/it is authorized to bind APPLICANT to each of the terms set forth herein and to the terms of the Policies.[9]

---

[3] The following facts are not genuinely in dispute, unless otherwise indicated, and are generally drawn from the parties' summary judgment briefing and attached affidavits and exhibits.  *See* Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; *see also Vazirabadi v. Denver Health and Hosp. Auth.*, 782 F. App'x 681, 687–88 (10th Cir 2019).

[4] Dkt. 2 (Complaint and Jury Demand) ¶ 18; *accord* Dkt. 74 (Answer) ¶ 18.

[5] Dkt. 173 (Response in Opposition to Defendant's Motion for Summary Judgment) at 2; *accord* Dkt. 162 at 1.

[6] Dkt. 162 at 1; *accord* Dkt. 173 at 2.

[7] Dkt. 164-1 (USANA Sealed Exhibits), Exhibit 4 (10/3/1997 Distributor Application and Agreement) [hereinafter 1997 Agreement].

[8] *Id.* ¶ 3.

[9] *Id.* ¶ 9.

> USANA reserves the right to terminate any Distributorship for cause as such is defined in the Policies.[10]

The 1997 Agreement also includes a list of Terms and Conditions, including:

> The Company reserves the right to terminate any distributorship at any[ ]time for cause when it is determined that the Distributor has violated the provisions of this Agreement, including the Polices and Procedures . . . .[11]

> In accordance with applicable state law, the Company reserves the right to change the Policies and Procedures which affect the Distributor . . . .[12]

The 1997 Agreement defined an initial term of one year, but provided that USANA would "automatically renew" the distributorship every year thereafter on the calendar date the Agreement was signed, unless Johnson notified USANA prior to that anniversary that she wished to terminate.[13]  Johnson maintained a successful USANA distributorship for many years thereafter, receiving awards in 2006 and 2007 "for having the biggest organizational growth worldwide in both years" among the entire company.[14]

<em>USANA Policies and Procedures</em>

USANA terminated Johnson's distributorship on June 21, 2011, claiming she had breached the 1997 Agreement after violating the company's Policies and Procedures by helping with the presentation of another multi-level marketing venture.[15]  As relevant here, the 2011 USANA Policies and Procedures provide:

> USANA Associates may participate in other direct selling or network marketing or multi-level marketing ventures (collectively, "multi-level marketing"), and Associates may engage in selling activities related to non-USANA products and

---

[10] *Id.* ¶ 12.

[11] *Id.* Terms and Conditions.

[12] *Id.*

[13] *Id.* ¶ 2.

[14] Dkt. 165 at 3.

[15] *See* Dkt. 164-1, Exhibit 21: June 21, 2011 Termination Letter [hereinafter Termination Letter]; *see also* Dkt. 164 ¶¶ 30–31; Dkt. 165 ¶¶ 13, 15.

3

services, if they desire to do so. However, Associates are prohibited from unauthorized recruiting activities, which include the following:

- Recruiting or enrolling USANA customers or Associates for other multi-level marketing business ventures, either directly or through a third party. This includes, but is not limited to, presenting or assisting in the presentation of other multi-level marketing business ventures to any USANA Preferred Customer or Associate, or implicitly or explicitly encouraging any USANA Preferred Customer or Associate to join other business ventures. It is a violation of this policy to recruit or enroll a USANA Preferred Customer or Associate for another multi-level marketing business, even if the Associate does not know that the prospect is also a USANA Preferred Customer or Associate . . . .[16]

An Associate's violation of any of the terms of the Associate Agreement, including any amendments that may be made by USANA in its sole discretion from time to time, constitutes a material breach . . . and may result, at USANA's option, in any of the disciplinary actions listed in section 8.3, including cancellation of his/her distributorship. Involuntary cancellation of a distributorship will result in the Associate's loss of all rights to his/her downline organization and any bonuses and commissions generated thereby.[17]

---

[16] Dkt. 164-1, Exhibit 6: 2011 USANA Policies and Procedures [hereinafter 2011 Policies & Procedures] § 3.6.

The parties seem to suggest in their briefing that the 1997 USANA Policies and Procedures may instead apply, but they note the relevant 1997 policies are largely identical in substance to the 2011 analogs, with only minor changes between the two. *See* Dkt. 162 ¶ 11; *id.* at 17 n.21; Dkt. 165 ¶ 3; *id.* ¶ 5. The court agrees it is unnecessary to resolve which version applies, because the operative text of each relevant section is materially the same. The 1997 analogs are reproduced here and in footnotes 17–18 for reference. The 1997 version of Section 3.6 provided:

USANA Distributors may participate in other direct selling or network marketing or multi-level marketing ventures (collectively, "multilevel marketing"), and Distributors may engage in selling activities related to non-USANA products and services, if they desire to do so. Although a Distributor may elect to participate in another multilevel marketing opportunity, he/she is prohibited from unauthorized recruiting activities, which include the following:

a) Recruiting or enrolling USANA customers or Distributors for other multilevel marketing business ventures, either directly or through a third party. This includes, but is not limited to, presenting or assisting in the presentation of other multilevel marketing business ventures to any USANA Preferred Customer or Distributor, or implicitly or explicitly encouraging any USANA Preferred Customer or Distributor to join other business ventures. It is a violation of this policy to recruit or enroll a USANA Preferred Customer or Distributor for another multi-level marketing business, even if the Distributor does not know that the prospect is also a USANA Preferred Customer or Distributor . . . .

Dkt. 164-1, Exhibit 7: 1997 USANA Policies and Procedures [hereinafter 1997 Policies & Procedures] § 3.6.

[17] 2011 Policies & Procedures § 12.2. In 1997, the analog to this policy provided:

A Distributor's violation of any of the terms of the Distributor Agreement, including any amendments which may be made by USANA in its sole discretion from time to time, constitutes a material breach of the Distributor Agreement and may result, at USANA's option, in any of the Disciplinary Actions listed in Section 8.3, including cancellation of his/her distributorship. Involuntary Cancellation of a Distributorship will result in the Distributor's loss of all rights to his/her Downline Organization and any bonuses and commissions generated thereby.

Violation of any of the terms and conditions of the Associate Agreement . . . by
an Associate, may result, at USANA's discretion, in one or more of the following
sanctions:
. . .

- Terminating a distributorship.[18]

### The Events of May 2011

On or about May 8, 2011, several USANA executives announced they were leaving the
company to work for an incipient entity called Ariix.[19]  At some point that month, Johnson
"communicated with the recently departed USANA executives" and was given information
about Ariix.[20]  Within one week of the executives' departure from USANA, Johnson flew to
Utah to meet with two of them, who by then had become Ariix's new CEO and CFO.[21]

Then, on May 26, 2011, Johnson hosted a conference call and invited several USANA
associates to participate (May 26 Call).[22]  The purpose of the call was to discuss compensation
opportunities potentially available if the attendees were to join Ariix,[23] and the Ariix CEO was

---

1997 Policies & Procedures § 12.2.

[18] 2011 Policies & Procedures § 8.3.  The 1997 analog to this policy provided:

All of the policies in the Distributor Agreement are material terms to the agreement between USANA and
each Distributor. Violation of any of the terms and conditions of the Distributor Agreement . . . by a
Distributor may result, at USANA's discretion, in one or more of the following corrective measures:
. . .

f)    Cancellation of the individual's Distributor Agreement . . . .

1997 Policies & Procedures § 8.3.

[19] Dkt. 164 ¶ 12.  Ariix had by then become the trade name for an entity called Celebrus, LLC, which was formed
and registered in January 2011. *Id.* ¶ 13. Johnson disputes paragraph 12 of USANA's facts, but her dispute centers
on her assertion that "Ariix was not yet an operational enterprise" at that time.  Dkt. 173 ¶ 12.

[20] Dkt. 165 ¶ 8.

[21] Dkt. 162 ¶ 18.  The parties present competing factual assertions concerning exactly what was discussed during
this meeting between Johnson and the two executives.  *See id.*; Dkt. 173 ¶ 18; Dkt. 165 ¶ 8; Dkt. 172 (Defendant's
Sealed Opposition to Plaintiff's Motion for Summary Judgment) ¶ 8.  However, neither party disputes that Johnson
met with these two individuals, and the content of what was discussed at the meeting is immaterial to resolving the
issues presented on summary judgment.  Accordingly, this is not a material dispute of fact.  *See infra* LEGAL
STANDARDS section.

[22] Dkt. 162 ¶¶ 21–22; *accord* Dkt. 173 ¶¶ 21–22.

[23] Dkt. 162 ¶ 19.  USANA asserts the purpose of the call was to "discuss Ariix and its compensation plan."  *Id.*
Johnson rejects this, claiming its purpose was to "gather information on the potential Ariix opportunity."  Dkt. 173

featured as a "guest speaker."[24]  Participants were directed to email questions to Johnson prior to

the call.[25]  Johnson then asked the CEO questions on participants' behalf.[26]  Of note, Johnson

made the following statements during the May 26 Call:[27]

- "Ok. Ok, everybody so we're going to go ahead and start. So I want to welcome [CEO] to the call. All of you already know this . . . but [CEO] is the president of Ariix. This amazing company that is getting ready to launch and we all have some very specific questions and I thought we just get on the phone and everybody's got a pad of paper and a pen to go over a few of the things to make it clear so that we really get it."[28]

- "So the starter kit, for people to get started, . . . [h]ave you established a number for that, whether its $25, $30 are we there?"[29]

- "So now the first question that I have because all of us, we're used to a binary. . . . [C]an you explain the even bonus to us and by that I mean how many people do you have to sponsor and who has to sponsor them, how do you get it . . . ? Cause that to me is absolutely key to what we're doing here."[30]

- "Ok, so anybody that's on the call we're all family here so if we're not clear that we could go over that one again with [USANA Associate] he just got that. And I think that's one of the keys to what we're doing here."[31]

- "Ok, so that sounds really good. So that's even better yet. Ok, so is everybody good on that or does anybody have another question on that?"[32]

---

¶ 19.  The court finds these claims are not mutually exclusive, and therefore the fact is not genuinely in dispute.  It is apparent from the record that, at the time of the call, Ariix's compensation plan had not been set in stone. However, that does not make USANA's assertion inaccurate because its potential compensation plan was discussed on the call.

[24] Dkt. 162 ¶ 18; *accord* Dkt. 173 ¶ 18.

[25] Dkt. 164 ¶ 23 *accord* Dkt. 173 ¶ 23.

[26] *See* Dkt. 162 ¶ 24(b), (f), (h).

[27] The forthcoming quotations are taken from a transcript of the May 26 Call.  Although Johnson disputes USANA's allegations concerning what the statements convey, she does not dispute the veracity of the transcript in reporting what was said.  *See* Dkt. 173 ¶¶ 25–26.  Thus, the content of these statements is not in dispute.  The court will not incorporate either party's legal argument into the factual record; therefore, consideration of USANA's conclusions on the broader meaning of Johnson's statements will be left for the forthcoming analysis on the legal issues.

[28] Dkt. 164-1, Exhibit 15: Transcript of May 26, 2011 Call [hereinafter May 26 Call Transcript] at 417, Box 23.

[29] *Id.* at 418, Box 27.

[30] *Id.* at 418, Box 35.

[31] *Id.* at 420, Box 56; *see also* Dkt. 162 ¶ 21 (identifying the person Johnson was discussing as a USANA associate who was on the call).

[32] May 26 Call Transcript at 421, Box 77.

- "Alright, so the next one we, I might as well just ask this one and then get to the big one. . . . [Y]ou also mentioned in the first three months that we're going to be getting three lines . . . for the first three months. Is that something that everybody gets, is that something that we have to pay for, these extra lines? How is that going to work for us as we think about a strategy to build?"[33]

- "Oh my . . . So everybody who joins in the first three months gets one power and three pay lines and it's Merry Christmas to us. So that's why we've got to get everybody in the first three months. Okay. Is everybody clear on that one?"[34]

- "Okay, perfect. Okay, so now we're going to the part that you're going to do some good notes and everybody's got to give input because I'm not clear on this - I want to get clarification on the matching bonus requirements . . . ."[35]

- "Anybody else have questions or comments on this? . . . I don't know the answer as to how I would vote, so I've got to talk to everybody like you said, [CEO], because the idea of getting 20% off of everybody you sponsor makes me really happy."[36]

- "Alright, so we have a few more minutes and I think we understand, we know what the starter kit is, the entry, we have it clear as far as how people can earn to get their autoships, which is absolutely fabulous. The matching bonus we'll have to discuss and come with a vote, a family vote, a group vote or team vote as to what we think and we can bring that to the meeting. Is there anything else, you guys, is there anything that you would like to ask regarding this compensation plan before we hang up – anything else that needs clarity?"[37]

- "That makes us really, really fortunate to get in in the first three months because you're going to give us some of these."[38]

- "Okay – still don't, I don't have that part yet. We've gotta talk about . . . the generations and the matching bonus. How much, and when you say 10% are you talking about if you've already got the 2x bonus so it would be 5% doubled or are you saying 10% doubled?"[39]

- "Okay, well, I mean it's so awesome [CEO] that this is so new, that we're going into prelaunch and it's a couple of weeks and it's so new that all of us here on

---

[33] *Id.* at 423, Box 110.

[34] *Id.* at 423, Box 114.

[35] *Id.* at 424, Box 117.

[36] *Id.* at 429, Box 187.

[37] *Id.* at 431, Box 207.

[38] *Id.* at 433, Box 247.

[39] *Id.* at 434, Box 252.

this call are getting to participate in the formulation of the pay plan for the company that's going to build our futures, so I'm just grateful for that, for what you just said because you know that we come out of the box with something that's so powerful and second to none that's going to make us all work hard and build our futures, but I don't understand the number of that bonus thing yet, but what I do know is I would like it to be set up so that the people who are doing the work are the ones who are rewarded and rewarded big. How that works I have no idea, but that's what I would like."[40]

- "Okay, anybody else have any questions? I just want to say thank you so much [CEO], for the opportunity."[41]

- "Yes. Well you did it, and thanks for even giving us a vote in things, too, that's awesome."[42]

- "[A]nd I feel like it's our company, you know."[43]

- "Okay, I think we're good. If nobody has any others, then we'll convene and come up with the next batch and talk about this. And [CEO] thank you . . ."[44]

Ariix did not start enrolling distributors until July 4, 2011.[45]  But by late May 2011, several other actions had been taken toward building up Ariix's operations, [46] including:

- Ariix had created a logo was using it on marketing materials.[47]

---

[40] *Id.* at 434, Box 259.

[41] *Id.* at 435, Boxes 263–64.

[42] *Id.* at 435, Box 266.

[43] *Id.* at 435, Box 268.

[44] *Id.* at 435, Box 272.

[45] *See* Dkt. 165 ¶ 16 (citing Dkt. 165-1 (Johnson's Exhibits), Exhibit 6: Fred Cooper Depo. at 96:3–99:9).  USANA purports to dispute this statement of fact.  *See* Dkt. 170 (Defendant's Redacted Opposition to Plaintiff's Motion for Summary Judgment) ¶ 16.  But it is clear USANA's dispute centers around whether the enrollment of distributors is relevant to whether Ariix was a "multi-level marketing business venture" under Section 3.6.  Thus, USANA disputes a legal consequence of the asserted fact, rather than the fact itself.  Because the court will not incorporate either party's legal arguments or assertions into the factual record, the dispute is not well-taken.  Accordingly, it is uncontroverted that Ariix opened for enrollment of distributors on July 4, 2011.

[46] Johnson objects to consideration of these actions, asserting they are immaterial because "USANA did not have any of the . . . information in its possession at the time it decided to . . . terminate [her] distributorship."  Dkt. 173 ¶ 17.  USANA counters that Johnson does not cite any record evidence to support her assertion regarding USANA's knowledge of the Ariix developments.  Dkt. 181 (Defendant's Redacted Reply in Support of its Motion for Summary Judgment) at 4.  Moreover, as discussed *infra* Section I.B, a party to a contract who is sued for breach may assert as a defense that the other party was not performing, regardless of whether the party being sued was aware of the nonperformance at the time.  For both of these reasons, Johnson's dispute is not well-taken, and the court finds these actions by Ariix both undisputed and material.

[47] Dkt. 164 ¶ 17.b.

- A "draft compensation plan" had been developed and distributed to people potentially interested in joining Ariix.[48]

- Labels had been designed for Ariix products.[49]

- A price had been established for a "starter kit," which is a term in the network marketing industry for "the start-up materials distributors are required to purchase when becoming a distributor."[50]

- In addition to the other executives already mentioned, Ariix had hired a Creative Vice President and Chief Product Officer.[51]

Shortly before the May 26 Call, USANA became aware of Johnson's involvement in planning the call, prompting it to conduct an investigation.[52]  Sometime in May 2011, a USANA customer contacted USANA's Compliance Committee to inform USANA that Johnson had been inviting several USANA customers and associates to join an "opportunity call for Ariix."[53]  After receiving the tip, USANA's General Counsel decided to listen in on the May 26 Call to investigate Johnson's involvement and confirm that it was indeed an "opportunity call," which he defined as "a call[] where the business opportunity side of a company is presented to people."[54]  While listening to the call, the General Counsel heard Johnson "presenting together

---

[48] *Id.* ¶ 17.d.

[49] *Id.* ¶ 17.f.

[50] *Id.* ¶ 17.h.

[51] *Id.* ¶¶ 17.a, 17.i.

[52] Dkt. 162 ¶¶ 30–31 (citing Termination Letter).  Johnson disputes this, claiming "[t]here was no investigation into this purported incident and [USANA] breached the contract by terminating [Johnson] without cause."  Dkt. 173 ¶ 31.  To the extent Johnson asserts USANA breached the contract, the objection is not factual but pertains to a legal argument.  Therefore, it will not be incorporated into the factual record.  As to the assertion that no investigation in fact occurred, Johnson cites to the deposition testimony of USANA's General Counsel.  *See* Dkt. 173 ¶ 31 (citing Dkt. 165-1, Exhibit 5: James Bramble Depo., at 33:8–34:21).  However, as USANA points out, the testimony Johnson cites actually supports that there was an investigation in the wake of the May 26 Call and, moreover, reveals that the General Counsel himself listened in on the call.  *See* Dkt. 183 (Defendant's Sealed Reply in Support of its Motion for Summary Judgment) ¶¶ 17, 31 (citing Dkt. 165-1, Ex. 5: James Bramble Depo., at 33:8–34:21).  Because Johnson's claim that no investigation occurred is not supported by the evidence she cites, it is not well-taken.  Therefore, the court adopts as an undisputed material fact that USANA conducted an investigation in the manner described both generally in the Termination Letter, and in greater detail elsewhere in the record.

[53] Dkt. 183-1 (Exhibits to USANA's Reply), Exhibit 28: Excerpt from Bramble Depo, at 33:20–34:10.

[54] *Id.* at 33:2–7.

with [the CEO] the Ariix opportunity," and he also heard the voices of several USANA associates and customers on the call.[55]  After the call, he spoke to Johnson and she admitted to participating in the call (although she denied violating any policy).[56]  The General Counsel wrote a summary of what he witnessed on the May 26 Call and presented it to the Compliance Committee.[57]  The Committee later received a full transcript of the call.[58]

After the Compliance Committee completed its investigation, the General Counsel sent Johnson a Termination Letter on the Committee's behalf.[59]  According to the Letter, the investigation "confirmed through several sources" that Johnson had engaged in "misconduct" by "directly or indirectly invit[ing] USANA [associates] to participate in an opportunity conference call for another multi-level marketing company."[60]  Further, the letter stated Johnson had "vocally promoted that opportunity several times" on the call.[61]  The Letter concluded that, in USANA's view, this conduct violated Section 3.6 of its Policies and Procedures.[62]

According to the Termination Letter, USANA's Compliance Committee met after the investigation had concluded and decided not to terminate Johnson's distributorship if she were to "agree[] to a public commitment to exclusivity to USANA," but Johnson declined.[63]  Then, in the Letter itself, USANA gave Johnson a final opportunity to take several actions that would purportedly "address the damage caused by [her] breach," but explained that if she did not agree

---

[55] *Id.* at 34:11–14.

[56] *Id.* at 34:17–21.

[57] *Id.* at 29:8–14; 34:15–17.

[58] *Id.*

[59] Termination Letter at 1.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.*

to those terms by June 24, 2011, then USANA would terminate her distributorship, effective June 21, 2011.[64]  Johnson did not agree to the terms, and her distributorship was terminated.[65]

*Procedural History*

Johnson filed her Complaint on June 20, 2017, bringing six causes of action against USANA and three related business entities.[66]  On September 5, 2017, USANA and its co-defendants filed a Motion to Dismiss all of Johnson's claims under Federal Rule of Civil Procedure 12(b)(6).[67]  The court heard oral argument on that Motion on February 8, 2018.[68] Following argument, the court denied in part the Motion to Dismiss as to Johnson's breach of contract claim but granted it in part by dismissing all other claims without prejudice.[69]

The court gave Johnson the opportunity to seek leave to amend her Complaint,[70] and she attempted to do so with three motions for leave to amend.[71]  A hearing was held on November 19, 2018 to consider Johnson's Second Amended Motion to Amend, and the court issued an oral ruling denying that motion with prejudice.[72]  At that same hearing, the parties stipulated to dismissing USANA's three co-defendants from the case.[73]  From that point forward, only

---

[64] *Id.*

[65] Dkt. 165 ¶ 15; *accord* Dkt. 170 ¶ 15.

[66] Dkt. 2.  Johnson originally named four Defendants in her Complaint: (1) USANA Health Sciences, Inc.; (2) USANA, Inc.; (3) USANA Acquisition Corp.; and (4) USANA Sensé Company, Inc.  *See id.* ¶¶ 13–16.  However, USANA Health Sciences, Inc. is the only remaining Defendant in this matter because all other Defendants were dismissed by stipulation before the parties filed their Cross-Motions for summary judgment.  *See* Dkt. 70 (Minute Order for Proceedings on November 19, 2018).  Therefore, throughout this Order, when the court discusses "USANA," it is referring only to USANA Health Sciences, Inc.

[67] Dkt. 3 (Defendants' Motion to Dismiss Complaint).

[68] Dkt. 25 (Minute Order for Proceedings on February 8, 2018).

[69] *Id.*

[70] *Id.*

[71] Dkt. 29 (Plaintiff's Motion for Leave to File Amended Complaint); Dkt. 35 (Plaintiff's Amended Motion for Leave to File Amended Complaint); Dkt. 46 (Plaintiff's Second Amended Motion for Leave to File Amended Complaint).

[72] Dkt. 70.

[73] *See id.*

Johnson's breach of contract claim against USANA remained (all other claims and defendants having been dismissed with prejudice).[74]

On October 22, 2021, the parties filed Cross-Motions for summary judgment on Johnson's breach of contract claim.[75]  Johnson seeks judgment as a matter of law, asserting the undisputed material facts show USANA breached the 1997 Agreement by terminating her distributorship "under a false pretense."[76]  In its Motion, USANA seeks dismissal of Johnson's breach of contract claim, arguing the undisputed material facts demonstrate USANA was within its contractual rights when it terminated the Distributorship.[77]  The court heard oral argument on the Cross-Motions on July 12, 2022, and took the matters under advisement.[78]

## LEGAL STANDARDS

A court grants summary judgment when "there is no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."[79]  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[80]  "Judgment as a matter of law is appropriate when the nonmoving party has failed to make a sufficient showing on an essential element of [her] case" for which she "has the burden of proof."[81]

---

[74] The scheduling order in this case was thereafter amended several times by stipulation, resulting in numerous extensions to the discovery and dispositive motions deadlines.  *See* Dkt. 83 (Order Granting Stipulated Motion to Amend Scheduling Order); Dkt. 85 (Third Amended Scheduling Order); Dkt. 94 (Order Amending Aug. 9, 2019 Amended Scheduling Order); Dkt. 98 (Order Amending Oct. 9, 2019 Amended Scheduling Order); Dkt. 103 (Order Granting Stipulated Motion Amending Dec. 17, 2019 Amended Scheduling Order); Dkt. 112 (Order Amending Mar. 2, 2020 Amended Scheduling Order); Dkt. 132 (Order Amending Apr. 24, 2020 Amended Scheduling Order); Dkt. 134 (Order Amending Oct. 16, 2020 Amended Scheduling Order).

[75] Dkts. 162, 164, 165.

[76] Dkt. 165 at 9–10.

[77] Dkt. 162 at 26–27.

[78] Dkt. 190 (Minute Entry for Proceedings on July 12, 2022).

[79] Fed. R. Civ. P. 56(a).

[80] *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

[81] *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012) (internal quotation marks and citation omitted).

In considering a motion for summary judgment, the court is to "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party."[82]  In so doing, the court's "function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[83]  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."[84]  It must be ascertained whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[85]

"Cross-motions for summary judgment are to be treated separately; denying one does not require granting another."[86]  Each "moving party carries the burden of showing beyond a reasonable doubt that it is entitled to summary judgment."[87]  Even though a defendant "does not have the ultimate burden of persuasion at trial," when moving for summary judgment, a defendant has "both the initial burden of production . . . and the burden of establishing that summary judgment is appropriate as a matter of law."[88]  This burden may be met by demonstrating that the plaintiff "does not have enough evidence to carry [her] burden of persuasion at trial."[89]  As to the plaintiff, the court "must view the evidence presented through the prism of the substantive evidentiary burden."[90]

---

[82] *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

[83] *Liberty Lobby*, 477 U.S. at 249.

[84] *Id.* at 255.

[85] *Id.* at 249.

[86] *Buell Cabinet Co., Inc. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979).

[87] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (internal quotation marks and citations omitted).

[88] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[89] *Id.*

[90] *Liberty Lobby*, 477 U.S. at 254.

## ANALYSIS

The 1997 Agreement provides that it is to be "governed by the laws of the State of Utah,"[91] and both parties' briefing analyzes the breach of contract claim pursuant to Utah law.[92] Thus, Johnson's breach of contract claim will be analyzed under Utah law.[93]  In Utah, "[q]uestions of contract interpretation which are confined to the language of the contract itself are questions of law" for the court to resolve.[94]  On the other hand, whether specific conduct qualifies as performance or breach under those terms is ordinarily a question of fact left for the jury, unless the party asserting the breach of contract claim is unable to meet its evidentiary burden to survive summary judgment.[95]

To establish breach of contract under Utah law, Johnson must show: "(1) a contract [between the parties], (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[96]  The parties do not dispute Johnson's ability to satisfy the first element, focusing their briefing on the second and third elements.[97]  As to the second element, USANA claims Johnson violated Section 3.6 of USANA's Policies and Procedures through her undisputed conduct in May 2011, meaning Johnson cannot show she was performing her obligations under the 1997 Agreement.[98]  Johnson contends the undisputed factual record

---

[91] 1997 Agreement ¶ 10.

[92] *See* Dkt. 162 at 15–16; Dkt. 165 at 7.

[93] *See, e.g.*, *Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 127 F. Supp. 3d 1214, 1226 (D. Utah 2015) (noting that, where a contract's "express terms" provide that it is to be enforced or interpreted according to Utah law, and one of the parties brings a breach of contract claim in federal court, "Utah law governs th[e] claim").

[94] *Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 7, 201 P.3d 1004.

[95] *See Cross v. Olsen*, 2013 UT App 135, ¶ 29, 303 P.3d 1030 ("Whether a breach of a contract constitutes a material breach is a question of fact. Therefore, the issue will ordinarily be resolved by the fact finder, and summary judgment should be granted with great caution." (quotation simplified)).

[96] *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224 (quotation simplified).

[97] *See* Dkt. 162 at 16; Dkt. 165 at 8.

[98] Dkt. 162 at 18–22.

yields the opposite conclusion, and therefore she has established performance as a matter of law.[99]  As to the third element, USANA argues Johnson cannot show that it breached because USANA was contractually entitled to terminate the Agreement based on Johnson's conduct in May 2011.[100]  Johnson, on the other hand, asserts USANA was not within its contractual rights to terminate her distributorship, and therefore she has established breach as a matter of law.[101]

Because there is significant overlap in addressing the parties' positions on both elements, the court will analyze the Cross-Motions together, addressing (I) whether any reasonable jury could find Johnson was performing her obligations under the 1997 Agreement at the time USANA terminated her distributorship, and (II) whether USANA breached or was within its contractual rights to terminate Johnson's distributorship if she violated the company's Policies and Procedures.  Based on the undisputed factual record, the court concludes Johnson cannot make her showing on either element, entitling USANA to judgment as a matter of law.

## I.   Johnson Was Not in Performance when USANA Terminated Her Distributorship

Johnson's ability to satisfy the second element by showing she was in performance presents two sub-issues: (A) whether the 1997 Agreement sufficiently incorporated USANA's Policies and Procedures such that Johnson was obligated to comply with them to remain in performance; and (B) if so, whether a reasonable jury could conclude that Johnson was complying with the Policies and Procedures at the time USANA terminated the distributorship. The court will address each issue, in turn.

---

[99] Dkt. 165 at 8.

[100] Dkt. 162 at 22–26.

[101] Dkt. 165 at 9.

A.  *The 1997 Agreement Obligated Johnson to Comply with USANA's Policies and Procedures*

As a threshold matter to analyzing whether Johnson can show she was in performance when her distributorship was terminated, the court must ascertain whether and to what extent USANA's Policies and Procedures were incorporated into the 1997 Agreement.

Contracts governing an employment or independent contractor relationship frequently incorporate policies of the employer that are enshrined elsewhere, making those policies enforceable under the terms of the contract.[102]  This practice is frequently employed in network marketing distributorship agreements.[103]  Sometimes, it is less than clear which policies the parties intended to be incorporated into their agreement, or whether they intended for external policies to be incorporated at all.[104]  Other times, incorporation of the policies is crystal clear.[105]  This case presents the latter scenario.

In several places, the 1997 Agreement expressly incorporates USANA's Policies and Procedures by reference.  One of the Agreement's first clauses states that Johnson, as the signatory, "has read and agrees to be bound by the terms of this Agreement, . . . and the Policies and Procedures, all of which are incorporated herein by reference and made a part hereof for all

---

[102] *See, e.g.*, *Moore v. Utah Tech. Coll.*, 727 P.2d 634, 642 (Utah 1986) (observing that schoolteacher's "notices of appointment expressly incorporated the school's 'policies' with regard to termination procedures").

[103] *See, e.g.*, *Wagner v. Clifton*, 2002 UT 109, ¶ 12, 62 P.3d 440 (noting that "Section 27 of the Nu Skin Policies and Procedures, which is incorporated into the distributorship agreement, contains the disputed . . . clause," and applying that section to a contract interpretation issue); *Backbone Worldwide Inc. v. LifeVantage Corp.*, 2019 UT App 80, ¶ 2, 443 P.3d 780 (noting that "LifeVantage's standard Independent Distributor Agreement . . . incorporated LifeVantage's Policies and Procedures" into the Agreement, and therefore "[t]he standard Independent Distributor Agreement, along with . . . the incorporated Policies and Procedures, constitute[d] the full agreement between the parties").

[104] *See, e.g.*, *Moore*, 727 P.2d at 641–43 (articulating a presumption that "contracts usually incorporate documents as they exist on the day the contract is formed," but going into a more in-depth analysis on whether the parties intended for latter versions of the employment policy to be included within the employment contract).

[105] *See, e.g.*, *Wagner*, 2002 UT 109, ¶ 12; *Backbone*, 2019 UT App 80, ¶ 2.

purposes."[106]  Second, by signing, Johnson agreed to be bound "to each of the terms set forth

herein and to the terms of the Policies."[107]  Third, "USANA reserve[d] the right to change . . . the

Policies in its sole discretion, and [Johnson] agree[d] to be bound by such changes.[108]  Finally, an

additional provision in the Terms and Conditions states that USANA "reserves the right to

change the Policies and Procedures which affect the Distributor."[109]

Thus, not only did the 1997 Agreement unambiguously incorporate USANA's Policies

and Procedures into the contract, it also allowed USANA to unilaterally change the Policies and

Procedures affecting the distributorship.  Accordingly, to remain in performance, Johnson was

required to adhere to both the 1997 Agreement itself and USANA's Policies and Procedures.

   B.  *Johnson Cannot Establish She Was Performing Under the Terms of the 1997*
       *Agreement Because Any Reasonable Jury Would Conclude She Engaged in Conduct*
       *Prohibited Under Section 3.6*

Because the 1997 Agreement expressly incorporated USANA's Policies and Procedures,

Johnson would not be performing her obligations under the Agreement if she violated any of

USANA's Policies.  USANA asserted in 2011—and maintains now—that Johnson violated

Section 3.6 of its Policies and Procedures.  For the reasons explained below, the court agrees and

concludes that, as a matter of law, Johnson violated the Agreement and cannot establish she was

in performance at the time her distributorship was terminated.

Although Section 3.6 permits USANA associates to themselves "participate in other . . .

network marketing or multi-level marketing ventures," they are prohibited from "presenting or

assisting in the presentation of other multi-level marketing business ventures" to other USANA

---

[106] 1997 Agreement ¶ 3.

[107] *Id.* ¶ 9.

[108] *Id.* ¶ 3.

[109] *Id.* Terms and Conditions.

associates, and from "implicitly or explicitly encouraging any USANA . . . Associate to join other business ventures."[110]  As presented by the parties in their Cross-Motions, the crux of this case largely comes down to: (1) whether Arrix was "a multi-level marketing business venture[]" in late May 2011, and (2) whether Johnson's actions before and during the May 26 Call constituted "presenting or assisting in the presentation of" that business venture to other USANA associates, or "implicitly or explicitly encouraging" them to join.

1. Ariix was a Multi-Level Business Venture by the End of May 2011

Whether Ariix qualified as "multi-level marketing business venture" in late May 2011 implicates two sub-issues: (a) whether Ariix utilized a multi-level marketing sales structure, and (b) whether Ariix was by then a "business venture."  The parties appear to agree that Ariix was a multi-level marketing entity, as the Ariix founders clearly envisioned using network marketing to sell its products, similar to USANA.[111]  But the parties vehemently disagree about whether Ariix was a "business venture" in late May 2011.[112]  Because the parties present arguments about both the interpretation of Section 3.6's terms, and whether those terms as commonly understood applied to Ariix,[113] their arguments implicate both legal and factual questions.[114]

---

[110] 2011 Policies & Procedures § 3.6.  As noted previously, the court assumes without deciding that the 2011 Policies and Procedures govern the issues in this case.  *See supra* note 16.  However, even if the 1997 Policies and Procedures governed Johnson's conduct in 2011, the terms of the 1997 version of Section 3.6 are not materially different from the 2011 version.  *See id.*  Therefore, the analysis would be essentially the same under either iteration.

[111] Dkt. 162 at 18; Dkt. 165 at 8.

[112] *Compare* Dkt. 162 at 18–20, *with* Dkt. 173 at 11–12.

[113] In her Motion for Summary Judgment, Johnson first asserts that USANA premised its decision to terminate on Johnson "actively recruiting USANA distributors to a competing network marketing company," and that this justification is illegitimate because Ariix was not a competing company enrolling distributors in May 2011.  Dkt. 165 at 8–9.  But this argument is inapposite because Section 3.6 does not require there to be a "competing network marketing company" for it to be triggered; it uses the term "business venture."  Thus, because Johnson does not couch this argument in the language of Section 3.6, she has not adequately engaged with her burden on summary judgment and the court will not consider the argument further.

[114] *See Mellor*, 2009 UT 5, ¶ 7; *Cross*, 2013 UT App 135, ¶ 29.

In support of its Motion, USANA points out that "business venture" is undefined in the Policies and Procedures, but asserts it should be given its ordinary meaning and cites two definitions from Black's Law Dictionary to create a combined definition.[115]  Black's Law defines "venture" as "an undertaking that involves risk; esp., a speculative commercial enterprise,"[116] and "business" as a "commercial enterprise carried on for profit."[117]  Combined, this would mean the common understanding of "business venture" is a speculative commercial enterprise carried on for profit.

Johnson attacks this proposed definition in her Opposition to USANA's Motion, yet she offers no alternative definition of her own.[118]  At oral argument, the court directly asked Johnson's counsel if USANA's definition was not correct, whether there was a proposed definition counsel would direct the court to.  Counsel did not provide a definition, instead asserting that the definition of "business venture," and whether Ariix met that definition, are factual matters that should be left for the jury to resolve.

But this contention runs contrary to Utah law, where "[t]he interpretation of a contract is a matter of law for the court to determine unless the contract is ambiguous and evidence of the parties' intent (which is a matter of fact) is necessary to establish the terms of the contract."[119]  A contract term is ambiguous if it "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[120]  The existence of an ambiguity is itself a question of law, but the court cannot recognize an ambiguity

---

[115] Dkt. 162 at 18–19.

[116] *Venture*, Black's Law Dictionary (11th ed. 2019).

[117] *Business*, Black's Law Dictionary (11th ed. 2019).

[118] *See* Dkt. 180 (Plaintiff's Reply to Motion for Summary Judgment) at 2.

[119] *Saunders v. Sharp*, 806 P.2d 198, 200 (Utah 1991).

[120] *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 20, 54 P.3d 1139 (quotation simplified).

on its own volition.[121]   The parties must argue that a provision is ambiguous and present

competing definitions of the term at issue before the court can conclude there is an ambiguity

and send the issue to the jury.[122]   Further, "a contract provision is not necessarily ambiguous just

because one party gives that provision a different meaning than another party does. To

demonstrate ambiguity, the contrary positions should each be tenable."[123]

Where there is no ambiguity, the court interprets the disputed language as a matter of law,

using only the contract and any incorporated documents.[124]   In that endeavor, Utah appellate courts

routinely cite Black's Law Dictionary to interpret and adopt the commonly understood meaning

of undefined contractual terms.[125]   In this case, USANA has offered a tenable interpretation of

the disputed term, supported by two Black's Law definitions.   While Johnson has proposed a

different understanding of the term, she has not put forth a tenable definition.   Accordingly,

because Johnson has not asserted that Section 3.6's language is ambiguous, nor has she offered

an alternative definition of her own, the court adopts the combined definition offered by USANA.

Next, the court must determine if there are genuine disputes of material fact about

whether, in late May 2011, Ariix was a speculative commercial enterprise carried on for profit.

Johnson argues Ariix cannot meet this definition, contending "it is plainly obvious that a network

---

[121] *Id.* ¶ 22.

[122] *See R&R Energies v. Mother Earth Indus.*, 936 P.2d 1068, 1074 (Utah 1997).

[123] *R&R Energies*, 936 P.2d at 1074 (quoting *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990)).

[124] *See Mellor*, 2009 UT 5, ¶ 7 ("Questions of contract interpretation . . . confined to the language of the contract itself are questions of law.").

[125] *See, e.g.*, *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶¶ 27, 32, 367 P.3d 994 (relying in part on a Black's Law Dictionary definition to conclude that plaintiff's interpretation of the contract was "strongly supported by the language of the agreement," but the defendant's interpretation was not, meaning that contract was not facially ambiguous); *Sutton v. Miles*, 2014 UT App 197, ¶ 19, 333 P.3d 1279 (relying on a Black's Law Dictionary definition to reject plaintiff's proffered definition of a disputed term, and therefore concluding the term was "not facially ambiguous and should be interpreted according to its general meaning"); *see also id.* ¶¶ 24–26 (relying on Black's to determine the "ordinary meaning" of two other undefined terms, and declining to adopt the "broader definitions of the terms" proposed by the plaintiff).

marketing company with no network to sell products can reap no profits; therefore it [was] not a viable business venture but merely an idea."[126]  In support, Johnson points to the fact that Ariix did not start enrolling associates until early July—several weeks after the May 26 Call.[127]

Yet the undisputed evidence shows that, as of late May 2011, Ariix was more than "merely an idea."  According to the undisputed factual record, it had at that point hired several executive-level employees, including its CEO, CFO, Creative Vice President, and Chief Product Officer.[128]  A "draft compensation plan" had been developed and distributed to people potentially interested in joining Ariix.[129]  A price had been established for the "starter kit" new Ariix distributors would need to purchase to begin selling.[130]  And Arrix had been sending out marketing materials, had designed a business logo, and was producing labels for its products.[131]

Perhaps Ariix was not yet enrolling associates by late May 2011, but the foregoing developments show it certainly qualified as a speculative commercial enterprise carried on for profit—no reasonable jury could conclude otherwise.  When interpreting a contract under Utah law, it is assumed that the parties' intentions are adequately presented by the text they choose.[132] And presumably, if USANA had intended for Section 3.6 to only apply when associates were recruited to join a full-fledged and mature company, as Johnson asserts, it would have said so in

---

[126] Dkt. 180 at 2.

[127] Dkt. 173 at 11.  Johnson maintained this position at oral argument.  The court asked when Ariix became a business venture, and Johnson's counsel postulated that Ariix became one as soon as the first distributor was enrolled, citing the "unique context of network marketing."

[128] Dkt. 164 ¶¶ 17.a, 17.h, 18.

[129] *Id.* ¶ 17.d.

[130] *Id.* ¶ 17.h.

[131] *Id.* ¶¶ 17.b, 17.f.

[132] *See iDrive Logistics LLC v. IntegraCore LLC*, 2018 UT App 40, ¶ 36, 424 P.3d 970 (noting the court's ultimate concern in a matter of contractual interpretation is to "ascertain the parties' intentions," starting with the "plain meaning of the contractual language" (quotation simplified)).

the text of the policies.  Instead, it adopted the term "business *ventures*"—phrasing which was present in the 1997 Policies and Procedures as well—which means USANA likely intended to encompass a wider range of entities at various stages of development, including organizations in their infancy (like Ariix was in May 2011).

Based on the plain meaning of Section 3.6 and the undisputed facts in the record, any reasonable jury would find that Ariix had become a "multi-level marketing business venture" by late May 2011.  Accordingly, the court will next address whether Johnson's conduct relating to Ariix constituted prohibited recruiting activities under Section 3.6.

  2. <u>Based on the Undisputed Factual Record, Johnson Assisted in the Presentation of a Multi-Level Marketing Business Venture to USANA Associates</u>

As noted above, Johnson does not dispute that she said any of the statements attributed to her on the May 26 Call, nor does she dispute that she intentionally invited—through herself and proxies—other USANA associates to join the call and submit questions to her ahead of time.[133] Nevertheless, Johnson resists the conclusion that she was "recruiting and enrolling" others to join Ariix.[134]  She contends the call was not used for recruiting purposes, characterizing it instead as a "fact-gathering exercise"[135]

But Johnson places too much emphasis on the words "recruiting and enrolling" alone.  To be sure, Section 3.6 broadly prohibits "unauthorized recruiting activities" and "[r]ecruiting or enrolling USANA customers or Associates for other multi-level marketing business ventures."[136] But the Policy goes on to define a non-exclusive list of more specific conduct that constitutes

---

[133] *See* Dkt. 173 ¶¶ 25–26.

[134] Dkt. 173 at 10–11.

[135] *Id.* at 11.

[136] 2011 Policies & Procedures § 3.6.

"unauthorized recruiting activities."[137]  Among the list of prohibited conduct is "assisting in the presentation of other multi-level marketing business ventures to any USANA Preferred Customer or Associate."[138]

On the undisputed facts of this case, it is evident that Johnson assisted in the presentation of Ariix to USANA associates.  She helped organize an opportunity call to inform others about the potential earnings they could enjoy from joining Ariix during the foundational stages.  She met with Ariix's CEO and CFO in Utah at some point in May before the call was held.  She directly and indirectly invited USANA associates and customers to join the call.  She initiated dialogue on the call and introduced the Ariix CEO as the guest speaker.  She solicited questions from participants ahead of time and fielded questions to the CEO on their behalf during the call.  And, most importantly, she made several statements indicating her involvement in the decisions being made as Ariix was coming into being—belying any notion that she was merely on the call to gather information.  These statements include:

- "So that's why we've got to get everybody in the first three months";

- "I don't know the answer as to how I would vote, so I've got to talk to everybody like you said";

- "The matching bonus we'll have to discuss and come with a vote, a family vote, a group vote or team vote as to what we think and we can bring that to the meeting";

- "I mean it's so awesome [CEO] that this is so new, that we're going into prelaunch and it's a couple of weeks and it's so new that all of us here on this call are getting to participate in the formulation of the pay plan for the company that's going to build our futures, so I'm just grateful for that"; and

- "I feel like it's our company, you know."[139]

---

[137] *See id.*

[138] *Id.*

[139] May 26 Call Transcript at Boxes 114, 187, 207, 259, 268.

Considering these undisputed facts collectively, there are no alternative inferences that a jury would be able to draw other than this: Johnson was assisting in the presentation of another multi-level marketing business venture to USANA associates.

Under the language of Section 3.6, to violate the Policies, Johnson need only have engaged in any one of the following prohibited actions: "presenting" Ariix to USANA associates or customers, "assisting in the presentation" of Ariix to USANA associates or customers, "explicitly" encouraging associates or customers to join, or "implicitly" encouraging them to join. Because the court has concluded that any reasonable jury would find, based on Johnson's undisputed conduct and statements, that Johnson was "assisting in the presentation of" Ariix to other USANA associates, the court need not address whether her statements qualify as one of the other three prohibited activities.

Based on the undisputed material facts, Johnson violated Section 3.6 of the USANA Policies and Procedures by assisting in the presentation of a multi-level marketing business venture to then-USANA associates. And because USANA's Policies and Procedures were expressly incorporated into the 1997 Agreement, by violating Section 3.6 Johnson cannot meet her burden of showing she performed her obligations under the Agreement. Indeed, she was in breach of the Agreement. Based on the undisputed factual record, no reasonable jury would be able to find in Johnson's favor on the second element of her breach of contract claim.

## II.   USANA did not Breach the 1997 Agreement by Opting to Terminate Johnson's Distributorship

Having determined that Johnson cannot establish performance of her contractual obligations due to her role in assisting with the May 26 Call, the court will proceed with addressing whether Johnson's nonperformance entitled USANA to terminate her distributorship. If USANA was entitled to terminate the Agreement based on Johnson's violation of its Policies,

24

then Johnson cannot make her showing on the third element of her breach of contract claim.[140] Because both the Policies and Procedures and the 1997 Agreement itself allow USANA to terminate a distributorship at its discretion whenever an associate violates the Policies and Procedures, the court concludes as a matter of law that USANA did not breach the Agreement by exercising its discretion to terminate Johnson's distributorship.

"Where a party has a legal right to terminate a contract, its motive for exercising that right is irrelevant."[141]  To ascertain the right to terminate, the court begins with the text of the parties' contract, including any external documents expressly incorporated therein.[142]  Under the 1997 Agreement, Johnson agreed to be bound by the USANA Policies, and "USANA reserve[d] the right to terminate any Distributorship for cause as such is defined in the Policies."[143]  Section 12.2 of the 2011 Policies and Procedures provides that if an associate/distributor violates the terms of a Distributor Agreement, then it is a "material breach" and "may result, at USANA's option, in any of disciplinary actions listed in section 8.3, including cancellation of his/her distributorship."[144]  In addition, Section 8.3 lists several sanctions USANA may take against associates/distributors in response to violations of the Policies.[145]  Termination is listed among

---

[140] *See Am. W. Bank Members*, 2014 UT 49, ¶ 15 (listing the elements of a breach of contract claim).

[141] *Backbone*, 2019 UT App 80, ¶ 22 (quotation simplified).

[142] *See id.* ¶¶ 18–19 (differentiating the situation where "the contract by its terms gives a party the express right to terminate the contract upon objectively defined criteria," from other situations where the contract leaves one party with "undefined discretion" to terminate based on mere dissatisfaction).

[143] 1997 Agreement ¶ 12.

[144] 2011 Policies & Procedures § 12.2.  The text of the 1997 version of this section is not materially different.  *See supra* note 17.

[145] *See* 2011 Policies & Procedures § 8.3.  The text of the 1997 version of this section is not materially different, with the main difference being the word "cancellation of the individual's Distributor Agreement" instead of "terminating a distributorship."  *See supra* note 18.

the possible sanctions, and the decision on whether and which sanction to impose is ultimately left to "USANA's discretion."[146]

At the outset, the text of the parties' full agreement appears on its face to sufficiently establish that USANA was within its rights to terminate Johnson's distributorship for any violation of the Policies and Procedures.  But for additional support, USANA directs the court to the outcome in *Backbone Worldwide Inc. v. LiveVantage Corp.*[147]  USANA points out that *Backbone* also involved "multi-level marketing companies, comparably placed associates, and almost identical contractual language."[148]  This case indeed presents a factual scenario analogous to what the Utah Court of Appeals faced in *Backbone*, where the parties' contract provided that "any breach of the Agreement . . . may result, at [the company's] discretion, in . . . [c]ancellation of the [Agreement]."[149]  The *Backbone* court concluded that termination of the distributorship had been proper based on that language and because the company had determined the distributor "committed objective, defined . . . breaches."[150]  USANA contends this case, like *Backbone*, presents a similar situation: where USANA exercised its right to terminate by first determining there was a breach according to "objectively defined criteria," and then applying discretion afforded to it under the contract to terminate in response to the breach.[151]

Johnson resists this application of *Backbone*, asserting the case "stands for the proposition that termination has to be objectively proper."[152]  But she does not explain why

---

[146] 2011 Policies & Procedures § 8.3.

[147] Dkt. 164 at 23–25 (citing 2019 UT App 80).

[148] Dkt. 183 at 18.

[149] *Backbone*, 2019 UT App 80, ¶ 4.

[150] *Id.* ¶ 32.

[151] Dkt. 162 at 25–26 (citing *Backbone*, 2019 UT App 80, ¶¶ 4, 21).

[152] Dkt. 173 at 13.

*Backbone* stands for that proposition, nor does she meaningfully address how USANA's decision to terminate her distributorship was not objectively proper.  On the court's review of *Backbone*, it appears Johnson may be drawing those principles from the case's discussion of the implied covenant of good faith and fair dealing, which generally provides that when a contract gives one party "sole and undefined discretion" to terminate, that party must exercise its discretion within the confines of "a good faith, objectively reasonable" standard.[153]

Moreover, the *Backbone* court explicitly held that the network marketing contract at issue was not subject to the covenant of good faith and fair dealing because, rather than giving the company open-ended, subjective discretion to terminate, the agreement gave the company discretion to terminate only when it "objectively determined" there had been a breach by the distributor.[154]  This gave the company "the right to cancel for any breach, no matter how slight."[155]  Accordingly, the implied covenant did not impact the company's exercise of its right to terminate.[156]  Similarly here, the 1997 Agreement, as well as the incorporated Policies and Procedures, define what constitutes a breach in objective terms and entitle USANA to terminate at its discretion once it objectively determines there has been a breach—no matter how slight. Accordingly, the holding in *Backbone* bolsters the court's conclusion that USANA did not breach by exercising its discretion to terminate after determining Johnson violated Section 3.6.

In a final effort, Johnson attacks USANA's recitation of all the actions Ariix had taken by late May 2011, arguing that USANA was not aware of any of those developments when it

---

[153] *See Backbone*, 2019 UT App 80, ¶ 17.

[154] *Id.* ¶¶ 21, 24.

[155] *Id.* ¶ 21.

[156] *Id.* ¶ 24.

terminated her distributorship.[157]  According to her, USANA was only aware of the May 26 Call at the time.[158]  Johnson argues the court cannot conclude USANA was entitled to terminate based on objective criteria if USANA was unaware of facts significant to finding that she violated Section 3.6.[159]  USANA counters in its Reply that this argument "fails as a matter of law," pointing to the Supreme Court's pronouncement in *College Point Boat Corp. v. United States* that a party may "justify an asserted termination, recission, or repudiation of a contract by proving that there was, at the time, an adequate cause, although it did not become known to [the party] until later."[160]

USANA is correct.  Under Supreme Court precedent, it is immaterial whether USANA was aware of any of the facts tending to prove Ariix was a business venture at the time of termination.[161]  Although *College Point Boat Corp.* involved a government contractor suit under federal common law,[162] the axiom has since been adopted by many other jurisdictions and extended to apply more broadly to all manners of contracts.[163]  Indeed, this principle is consistent with Utah contract law.[164]  As a result, Johnson's final argument is unavailing.

---

[157] Dkt. 173 at 11–12.

[158] *Id.* at 12.

[159] *See id.* 12, 14.

[160] Dkt. 183 at 17 (quoting *College Point Boat Corp v. United States*, 267 U.S. 12, 16 (1925)).

[161] *See College Point Boat Corp*, 267 U.S. at 16.

[162] *See Linan-Faye Constr. Co. v. Housing Auth.*, 49 F.3d 915, 922–24 (3d Cir. 1995) (in case involving a federal government contract, citing the same text from *College Point Boat Corp* as the inception of "a judge-made doctrine that allows an actual breach by the government to be retroactively justified" under federal common law).

[163] *See, e.g.*, *In re B&M Linen Corp.*, No. 12-11560, 2013 Bankr. LEXIS 2832, at *14–16 (Bankr. S.D.N.Y. July 12, 2013) (citing the same text from *College Point Boat Corp* and collecting cases on other jurisdictions in which the doctrine has been applied); *accord* 14 Williston on Contracts § 43:12 (4th ed.) ("[O]ne party's material failure of performance has the effect of the nonoccurrence of a condition of the other party's remaining duties even though that other party does not know of the failure.").

[164] *See Backbone*, 2019 UT App 80, ¶ 22 ("Where a party has a legal right to terminate a contract, its motive for exercising that right is irrelevant." (quotation simplified)).

After concluding Johnson had violated the 2011 Policies and Procedures according to objective criteria, USANA acted within its discretion under the 1997 Agreement when it decided to terminate Johnson's distributorship.  Accordingly, as a matter of law, USANA did not breach the Agreement.  Thus, Johnson cannot establish the third element of her breach of contract claim.

## CONCLUSION

Based on the undisputed factual record, Johnson cannot meet her burden on the second and third elements of her breach of contract claim, entitling USANA to judgment as a matter of law.  The court therefore GRANTS USANA's Motion for Summary Judgment[165] and DENIES Johnson's Motion for Summary Judgment.[166]  As noted above, all other claims and defendants have previously been dismissed in this case.[167]  Accordingly, there being no remaining issues for the court to consider, the Clerk of Court is directed to close the case.

SO ORDERED this 30th day of September, 2022.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[165] Dkt. 162.

[166] Dkt. 165.

[167] *See* Dkt. 25; Dkt. 70.